**HOURIGAN, KLUGER & QUINN**
A PROFESSIONAL CORPORATION

BY:   Joseph A. Quinn, Jr., Esquire          ATTORNEYS FOR PLAINTIFFS
      Kevin C. Quinn, Esquire
      Brian Q. McDonnell, Esquire
      Nicole M. Santo, Esquire

IDENTIFICATION Nos.  01810; 53625; 204089; 309043

LAW OFFICES
600 THIRD AVENUE
KINGSTON, PA 18704-5815
(570) 287-3000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY ELIZABETH JORDAN          :
FLICKINGER, O.D., and JAMES    :
BRADLEY FLICKINGER, O.D.,      :
Individually and as Parents and Natural :
Guardians of D.J.F., a minor and J.B.F., :     CIVIL ACTION – LAW
a minor,                       :
          Plaintiffs  :
      vs.              :     ***JURY TRIAL DEMANDED***
TOYS "R" US-DELAWARE, INC.,    :
                               :
       Defendant    :     No.  3:10-CV-00305
                               :
                               :     (JUDGE CAPUTO)

## PLAINTIFFS' PRE-TRIAL MEMORANDUM

Plaintiffs, Mary Elizabeth Jordan Flickinger, O.D. ("Dr. Flickinger"), and

James Bradley Flickinger, O.D., individually and as the parents and natural

guardians of D.J.F., a minor, and J.B.F., a minor (collectively "Plaintiffs"), hereby

submit their Pre-Trial Memorandum in accordance with L.R. 16.6. and Court

Order.

951016.1

**Date Conference was held by counsel:**      March 24, 2011.

**A.      A brief statement as to federal court jurisdiction.**

The subject incident occurred in New York.  The Plaintiffs are residents of

Pennsylvania.  Defendant, Toys "R" US-Delaware, Inc., (hereinafter "Toys "R"

Us"), is incorporated in Delaware and has a principle place of business in New

Jersey.  Suit was filed in the United States District Court for the Middle District of

Pennsylvania.  Jurisdiction is proper pursuant to 28 U.S.C. §1332 because (a)

there is complete diversity of citizenship between the Plaintiffs and Defendant;

and (b) the matter in controversy exceeds the sum of $75,000.00 exclusive of

interest and costs.

**B.      A summary statement of facts and contentions as to liability.**

<u>A SUMMARY STATEMENT OF FACTS</u>

On Sunday, October 26, 2008, Plaintiffs, Dr. Flickinger and Dr. Brad

Flickinger, both optometrists employed by Northeastern Eye Institute (NEI) in

Scranton and Clarks Summit, Pennsylvania were in New York City with their two

minor sons, Plaintiffs, D.J.F. and J.B.F.  The family saw *The Lion King* and did

some sight-seeing the day before and stayed overnight in the city.  Before

returning to their home on Sunday in Clarks Summit, Plaintiffs visited the Toys

"R" Us international flagship store located in Times Square.  This Toys "R" Us

store is no ordinary toy store. In addition to selling children's toys, it also has numerous attractions common to an amusement park. It is a very popular tourist destination and draws thousands of visitors each day.

At Toys "R" Us the family rode on the giant Ferris wheel and browsed the numerous toy departments. Beth and Brad were primarily interested in learning what the boys wanted for Christmas that year. After browsing for some time the family decided to head home. Before leaving the store, however, Beth took her two sons to "Candy Land" while Brad went to retrieve the family car from the nearby hotel.

In Candy Land there was a large circular custom-built display holding twenty-six (26) large rectangular plastic bins full of M&M candy. Because Toys "R" Us discarded this custom-built display after the incident in question and is unable to produce any documents concerning the display's dimensions, those dimensions are unknown. Each of the plastic bins contained a different color of M&M candy. The plastic bins were controlled by a lever mechanism and were designed for self-service by a customer. To obtain M&M candy a customer would simply pull the lever on the front of the plastic bin towards him or her and the candy would then flow *via* gravity downward out of the plastic bin through a spout opening and into a bag that the customer would place at the mouth of the spout.

951016.1

Toys "R" Us invited its customers to use the lever mechanism and to serve themselves with their desired M&M candy.  There were no warnings given to the customers with respect to the M&M display or the individual plastic bins.

After viewing the various colors of M&M candy for sale J.B.F., then age five (5), decided he wanted to purchase some green M&M's.  Beth and her two sons proceeded to the bin containing the green M&M's.  Beth pulled on the lever of the bin containing the green M&M's.  For some reason, however, the green M&M's would not dispense.  An unidentified male employee of Toys "R" Us simultaneously noticed Plaintiffs having difficulty obtaining their green M&M candy.  That employee approached Plaintiffs and said, "ma'am, may I help you, we've been having some trouble with these."  The employee then lowered the bin from the display stand *via* a swing down arm, opened the lid to the bin, and manually scooped out of the top of the bin some green M&M's for J.B.F.  Prior to October 26, 2008, this was a common practice by Toys "R" Us employees whenever candy got jammed and was an improper and unsafe use of the candy dispenser.  A safer alternative for relieving the candy jam existed by simply adjusting a flow regulator on the front of the plastic bin.

After J.B.F. received his green M&M's, his older brother D.J.F., then age seven (7), decided he wanted some of the blue M&M's that were located in a bin

951016.1

4

on the opposite side of the display stand.  Beth and her two boys proceeded to the bin containing the blue M&M candy.  It is unknown where the employee who assisted them with the green M&M's was at that point.

Beth pulled on the lever of the bin containing the blue M&M candy expecting the candy to flow down and into her bag.  Once again, however, nothing happened.  Beth then pulled on the lever a second time, again expecting the candy to flow down and into her bag.  On her second attempt at pulling the lever, the large plastic bin suddenly and unexpectedly dislodged from the display, struck her in the right forehead, and caused her neck to twist to the left and snap backwards.  After striking her in the head, Beth assumed a catcher's like position as she crouched down and cradled the bin to prevent it from falling onto her sons or the ground.  Beth lost vision briefly and was quite dazed for several minutes.

Unbeknownst to Beth and her two sons, at the time of this incident the large plastic bin containing the blue M&M's was not secured and/or properly secured to the display.  After striking Beth, the large plastic bin remained on her body for a few minutes before two female Toys "R" Us employees, whose identities again were not revealed to Beth at the time, helped lift the heavy bin off of her.  The bin was then carried to the cash register table where it remained for the rest of the day.  There were no broken parts on either the bin or the display itself.  All witnesses

951016.1

who have been asked for a possible explanation  acknowledge that the only reason they can think of as to why the bin became dislodged and struck Beth is that the bin had not been properly secured to the display by a Toys "R" Us employee.  To that end, Toys R" Us has admitted that at all times relevant to this action, it was in exclusive control of the display and its component parts.  J.B.F. and D.J.F. were right beside their mother and watched the large plastic bin full of blue M&M's strike her and remain pinned on her.

The impact to Beth caused severe and permanent injuries.  She sustained, *inter alia*, cervical disc herniations and bilateral atlantoaxial joint mediated neck pain and headaches.  She has undergone repeated rhizotomies to the cervical nerve at C2 and will likely require additional rhizotomies and/or atlantoaxial joint fusion surgery in the future.  In additional to claims stemming from these personal injuries, Plaintiffs are also pursuing a substantial wage loss and loss of earning capacity claim on behalf of Beth, a successful optometrist at NEI, whose earnings and earnings potential have been significantly impacted as a direct and proximate result of the injuries she sustained in the foregoing incident.

Since Plaintiff D.J.F. was in the zone of danger at the time of this incident and sustained emotional distress as a result of observing the injury to his mother, Plaintiffs are also pursuing a negligent infliction of emotional distress claim on his

951016.1

behalf. Plaintiffs are no longer pursuing an emotional distress claim for the

younger brother, J.B.F. Additionally, Brad has asserted a loss of consortium

claim.

<u>CONTENTIONS AS TO LIABILITY</u>

The M&M display was within the exclusive control of Toys "R" Us. No

entity other than Toys "R" Us was responsible for filling, cleaning, inspecting,

repairing, or otherwise maintaining the display. In fact, Toys "R" Us delegated

these duties to a specific department within the store, the Visual Department. The

Visual Department was headed by Suzanne Sallata at the time of the incident.

Moreover, a Toys "R" Us employee named Gloria Whitehead was primarily

responsible for filling the M&M bins each morning before the store opened.

At the time of the incident, the M&M bins were attached to the display by a

mechanism called a "swing down arm." The purpose of the swing down arm was

to make it easier for Toys "R" Us employees to re-fill the bins. The swing down

arm allowed the bin to be lowered from the display to about an employee's waist

so that an employee could then remove the lid to the bin and re-fill the product

with greater ease. The bin was secured to a custom made plate that was attached

to the arm. The bin had four tabs that fitted into four corresponding slots on the

plate that was attached to the arm. After re-filling the bin, an employee would

951016.1

then retract the swing down arm and bin to its original position in the display. Of note, the manner in which an employee should assist the bin in retracting is counter-intuitive. Box thirteen (13) in the Installation Instructions indicates that an employee should slightly pull out, not push up, on the bin spout to assist the bin in retracting. A customer like Beth was only responsible for pulling on the tap on the front of the bin to serve himself or herself with the desired candy. She would not engage the swing down arm.

Gloria Whitehead testified that the above-noted instructions and warnings[1] from Trade Fixtures were kept in a black binder behind the cash register in Candy Land. Every employee who worked in Candy Land had access to these instructions and warnings. Remarkably, however, Ms. Whitehead's two (2) immediate supervisors in Candy Land, Jesus Orengo and Marybet Rosado, testified that they were not even aware that these instructions/warnings existed.

---

[1] The instructions from Trade Fixtures contained a warning in red capital letters, which provided:

> WARNING: SERIOUS INJURY, OR BODILY HARM IS POSSIBLE BY NOT PROPERLY INSTALLING, AND SECURING THE SWING DOWN ARM. PLEASE READ AND FOLLOW THESE INSTRUCTIONS FOR A PROPER INSTALLATION. ALWAYS INSPECT GRAVITY BINS DAILY TO ENSURE THE BINS AND SWING DOWN ARMS ARE SECURE ON THE SHELF.

Additionally, the manager of the department responsible for visual displays, Suan

Sallata, testified that she was not aware that the instructions/warnings existed.  <u>See</u>

Moreover, Ms. Whitehead testified that although she was personally responsible

for training employees on how to operate the M&M display, she did not bother to

advise them that the manufacturer's written instructions and warnings were kept in

a the black binder behind the cash counter.  Thus, by all accounts, Ms. Whitehead

was the only one who was aware of these instructions and warnings.

Gloria Whitehead testified that she was aware of problems encountered with

the M&M's prior to October 26, 2008 where M&M candy would either flow out

too fast or would get stuck in the chute.  She knew how to fix this problem by

adjusting the flow regulator on the front of the bin.  Nonetheless, when confronted

with a candy jam she would not bother with the flow regulator, but would instead

lower the bin on the swing down arm and manually scoop out the candy for the

customer.  She knew other employees did the same thing.  In fact, she did not

believe many other employees knew about the flow regulator.  Ms. Whitehead was

well aware of the dangers that existed if the bins were not properly secured and

conceded that lowering the bin to manually scoop out the candy was not how the

candy dispenser was intended to be used and was improper.  Notwithstanding her

knowledge, Ms. Whitehead testified that she would engage in this improper

951016.1

practice because "I don't want to lose the sale." In so stating, Ms. Whitehead admitted to promoting sales over customer safety.

Above Jesus Orengo and Marybet Rosado was Richard Oswald who at the time of the incident was either the Manager for the Second Floor or World Manager for the Action and Candy Departments. In either capacity, Mr. Oswald had upper level supervisory responsibilities over the Candy Land department on October 26, 2008. Richard Oswald testified that he was not aware of the practice where employees were lowering the bins to manually scoop out the M&M candy whenever the candy got jammed. If this were brought to his attention, however, he testified that he would "tell them to stop immediately" ... "because that is not how the machine works." He added, "If the display is not working correctly, we need to get [V]isual, who was in the building the majority of the time, to fix it. So at the present time we could have emptied the dispenser and waited for them to fix it." He conceded that the more one lowers those bins, the more the possibility exists for something bad to happen.

Jesus Orengo testified that he was not aware of the practice where employees were lowering the bin and manually scooping out the candy, but would allow it as a manager even though he knew that is not the way to operate the machine. He stated, "Sure, I mean, you know, if it was something, you know,

951016.1

where the M&M's are just having issues coming down, yeah to be – to give the customer satisfaction, yeah, sure, why not ... .''

In essence, Ms. Whitehead and her Toys "R" Us colleagues[2] who either engaged in or knowingly permitted this improper practice promoted sales over customer safety.  This is especially egregious when the flow regulator, a safer alternative to lowering the bins, existed and was known about by Toys "R" Us.

There was nothing defective about the bin that struck Beth or the larger display.  As can be seen in the two color photographs of the actual bin and display taken after the incident occurred and filed with the Guest Incident Report, there were no broken pieces or parts.  The Guest Incident Report indicates that there was nothing sharp, broken, or defective about the display.  Moreover, the Guest Incident Report affirmatively states, without qualification, that the incident could have occurred as the guest (Beth) stated.  Gislane Morel, a Toys "R" Us employee who allegedly witnessed the incident occur, testified that she did not observe any broken pieces or parts when she inspected it after it fell and struck Beth. Likewise, Lisa Lozada, the Toys "R" Us manager on duty who responded to the

---

[2] In addition to Gloria Whitehead, Ms. Morel and Laura Godino admitted to knowing about this improper practice.  Ms. Morel testified that she had done it herself on occasion.

951016.1

incident and completed the Guest Incident Report, testified that someone demonstrated to her that day after the store closed how the bin attaches and unattaches to the plate on the swing down arm. Thus, there was nothing defective or broken about the bin or display. Rather, Beth was injured simply because the bin was not secured and/or properly secured to the display by Toys "R" Us employees. By its own policy, Toys "R" Us employees were responsible to "[e]nsure that displays are stable and secure at all times." In this instance, Toys "R" Us clearly did not follow its own policy nor did it follow the manufacturer's written instructions and warnings that were kept in a black binder a few feet away from the display and that only one (1) employee apparently knew about.

Several Toys "R" Us employees concede, as they must, that this bin is not suppose to fall off the display. See deposition of Sallata at p. 132 (agrees that if things were as they should have been with the display then the bin should not have come out of the display); deposition of O'Keefe at p. 15 (agrees that one had to be sure that the bin was secured on the receiving arm by the tabs and slots for it to be secure in the display); deposition of Orengo at pp. 64-65 & 98 (agrees that if the tabs are not properly placed into those slots, the bin will be unsecured and will come down); deposition of Morel at p. 107 (even if Daniel pulled on the tap hard,

951016.1

12

the bin is not supposed to fall out of the display[3]).

Beth did not do anything out of the ordinary or improper when she tried to obtain the blue M&M's. She simply pulled on the lever as it was designed for and as she was invited to do by Toys "R" Us. Also, while there may have been a problem with the green M&M's before Beth attempted to access the blue M&M's, this did not put her on notice of what was about to occur. In this regard, Beth testified,

> When the employee had said prior we've been having some trouble with some of the these, I had absolutely no idea what that meant, nor did I ask. My main concern was making the kids happy with their colored M&M's. And since I was there as the only parent, making sure they stayed with me and safe.
>
> So when he said to me we're having trouble with some of these, I had no idea what that meant. And not to sound callous, I really didn't care to know what that meant. He did not, when he said this, say that there was any

---

[3] Contrary to Beth's testimony, Gislane Morel testified that Beth's older son, D.J.F., was pulling hard on the lever for the blue M&M's and that Beth intervened by placing her hand over D.J.F.'s hand so as to show him how to be gentle. According to Ms. Morel, the bin came off the display and struck Beth in the head when her son pulled again on the lever and Beth had her hand on his hand. According to Ms. Morel, she heard Beth say to D.J.F., "not so hard." Ms. Morel is the only one to claim that someone other than Beth pulled on the handle. Plaintiffs dispute that D.J.F. pulled on the tap. Beth testified unequivocally that she alone pulled on the tap. Nonetheless, even if it occurred the way Ms. Morel claims it did, the bin should not have come off the display. Ms. Morel, and all other Toys "R" Us employees questioned on the subject, conceded the same in their depositions.

danger with the unit. He did not say that there was any danger with any other units.

When he then left me and we left and he did whatever he did with the green M&M's when he was done scooping them, he did not ask to assist me with any other units. He did not follow me to any other units. He did not say if you need to dispense any other colors, please come get me first.

There was no signage indicating that these units were damaged. There were no employees patrolling these areas making sure people [did not ] use any damaged areas. So, in essence, I assumed the safety of the machine.

According to Suzanne Sallata, the staff of the Visual Department would inspect the bins each morning before the store opened. Ms. Sallata testified that her staff would give the M&M bins a visual "once over ... to make sure it looks like it's supposed to look" as they were making morning rounds. Such "inspections," if it could even justifiably be called inspections, were woefully inadequate especially in light of the admitted misuse of the display prior to October 26, 2008. Nonetheless, Ms. Whitehead and Ms. Rosado testified that a bin would stick out a few inches and would be noticeable upon visual inspection if it was not properly secured to display. Therefore, even if Toys "R" Us only conducted a casual inspection it should have discovered that the bin was not secured and/or properly secured. Had Toys "R" Us conducted a proper and timely inspection of the bin and display, it could have remedied the dangerous condition it created or warned Beth of same, thereby preventing her injury.

951016.1

14

Contrary to Ms. Sallata's testimony regarding inspection of the M&M display, Ms. Morel testified that the staff of the Visual Department actually lowered the arm for every bin so as to inspect each bin and arm and then retracted each arm/bin back into place. If this were true, then the daily lowering and raising of the arms increased the risk that a bin would become dislodged from one of the arms.

As head of the Visual Department, Ms. Sallata acknowledged it was her responsibility to "ensure that displays are secure and stable at all times," as mandated by the Toys "R" Us Team Member Guide. Yet, Ms. Sallata testified that there were no written procedures, protocols, guidelines, or checklists provided by Toys "R" Us to assist her or her staff in carrying out this responsibility for any display in the store, including the M&M display. There was nothing in writing that told the staff of the Visual Department how to conduct their inspections. Based on such utter lack of training and/or instruction on conducting inspections, it is no wonder Toys "R" Us failed to discover that the blue M&M bin was not secured and/or properly secured to the display.

Equally troubling is Toys "R" Us' failure to ensure timely and proper reporting and investigation of incidents involving guests, like Beth. The Toys "R" Us General Liability Standard Operating Procedure in effect at the time of the

951016.1

incident requires that managers must "locate and interview any witnesses, including Team Members in the area prior to the incident occurring." Additionally, a written statement must be generated from any witness to the incident.

As noted above, Ms. Morel claims to have witnessed the incident involving Beth. Ms. Morel was working at the cash register in Candy Land at the time. Ms. Morel testified that she reported the incident to Mark Anthony Jack, who was working in Loss Prevention, and specifically advised him that she saw the incident happen. Mr. Jack then radioed Lisa Lozada, a manager on duty in the Babies "R" Us department. According to Ms. Morel, she also advised Ms. Lozada that she eye witnessed the incident. Additionally, over the next few days, Ms. Morel says she advised Jesus Orengo, a Manager in Candy Land, as well as Rich Oswald, what she saw with respect to the bin falling on Beth. If Ms. Morel is to be believed, neither Ms. Lozada, Mr. Orengo, nor Mr. Oswald asked Ms. Morel to complete a witness statement.[4]  Morel testified that she did not complete a witness statement even though she knew she was supposed to. The Guest Incident Report

---

[4] It bears mentioning that Ms. Lozada, Mr. Orengo, and Mr. Oswald were aware of the standard operating procedure at Toys "R" Us at the time of the incident that required securing a written statement from an eye witness, yet deny that Ms. Morel told them that she eye witnessed the incident in question.

951016.1

that was completed by Ms. Lozada indicates that there were no witnesses to the incident.

Furthermore, even though her department was in charge of the M&M display, Ms. Sallata was never notified of the incident. She was not asked to inspect the display after the incident. Toys "R" Us standard operating procedure required that any object involved in a guest incident must be preserved for "future investigation." The subject custom-built display was discarded shortly after the incident occurred, which raises spoliation issues. Thus, the department in charge of this display was never given an opportunity to conduct an investigation to see if there were problems with the display or whether it was being misused. By all accounts, the subject bin was just put back into service. Such abject failure to properly investigate and document the incident involving Beth exhibits a consciously indifferent and cavalier attitude towards customer safety.

Ms. Morel testified that the blue M&M bin was half full when it fell and struck Beth. She testified that when full, the M&M bin was "really heavy." Likewise, she testified that when the bin was "pretty full it was pretty heavy." As noted above, Toys "R" Us knew that the M&M bin had to be secured to the display. Toys "R" Us knew that if the bin was not properly secured to the display, it would "come down." See deposition of Sallata at p. 54 (agrees that it was

951016.1

17

important for these bins to be attached to the display and that it would be a danger if the bins were not properly attached); deposition of O'Keefe at p. 15 (agrees that one had to be sure that the bin was secured on the receiving arm by the tabs and slots for it to be secure in the display); deposition of Orengo at pp. 64-65 & 98 (agrees that if the tabs are not properly placed into those slots, the bin will be unsecured and will come down). Toys "R" Us knew these bins were heavy, especially when filled with product. See deposition testimony of Morel, supra. Toys "R" Us knew that a guest would pull on the tap of the M&M bin in order to serve himself/herself with the desired candy. Toys "R" Us knew that small children frequented Candy Land with their parents. Mark Anthony Jack, who was responsible for asset protection at Toys "R" Us testified, "we deal with a lot of kids ... we kind of have to be their eyes and ears, you know, because we have thousands of kids that come through the store every day. You know they are looking for everything else except a safety hazard." The failure of Toys "R" Us to secure and/or ensure that the M&M bin was secured to the display was recklessly indifferent to the health and safety of its guests in Candy Land, including Beth Flickinger and her two small boys.

**C.  A comprehensive statement of undisputed facts as agreed to by counsel at the conference of attorneys required by Local Rule 16.3. No facts should be denied unless opposing counsel expects to present contrary**

**evidence or genuinely challenges the fact on credibility grounds. The parties must reach agreement on uncontested facts even though relevancy is disputed.**

It is undisputed that Beth and her two minor children, D.J.F. and J.B.F., were in Candy Land at the Toys "R" Us store located in Times Square, New York City on October 26, 2008 and while in Candy Land Beth was struck in the head by a candy bin containing light blue colored M&M candy that came off a circular display containing twenty-six (26) bins of various colors. It is undisputed that the subject candy bin is intended for self-service by a customer and that to obtain candy a customer is invited to pull on a lever on the front of the bin and to place a bag underneath the spout of the bin. The subject candy bin and display were manufactured by Trade Fixtures, L.L.C. and/or Trade Fixtures New Leaf Designs, L.L.C. From when the Times Square Toys "R" Us store opened in November 2001 to the date of the incident, October 26, 2008, such an incident like Plaintiffs never occurred before at Toys "R" Us.

**D.    A brief description of damages, including, where applicable:**

After being struck with the bin, Beth lost vision for a few seconds. She was also quite dazed and confused for a period of time. She eventually collected herself enough to proceed to the check-out counter to pay for the green M&M candy that she obtained. At the register, Beth requested a manager, but a store

951016.1

19

manager could not be located.  Since no manager was present, Beth decided to leave the store with her boys and try to locate Brad at the family car.  As she was leaving she informed Toys "R" Us that she would call on her way home to verbally report the incident since they could not presently locate a manager. Before she left, an employee asked if she would like to be treated by a local doctor.  Beth replied that she would seek treatment at home.  When she reached Brad at the hotel, she had a goose egg right above her right eye.  Brad applied a cold soda can to the contusion right away.  Brad, an optometrist, also did a quick neurological assessment.  He checked her eye motility and pupil function.  She appeared oriented to time, place, and event.  Brad asked Beth if she wanted to go to a doctor in New York.  Beth was adamant, however, that she just wanted to go home.

After the family got through the Lincoln Tunnel, Beth called Toys "R" Us and asked to speak with the head manager.  After some time on hold, Toys "R" Us found a manager and Beth reported the incident over the phone.

The next day, Beth had neck soreness and stiffness and had some headaches.  Beth called her friend and radiologist, Jaime Stallman, M.D.  Beth described for Dr. Stallman what happened the day before at Toys "R" Us.  Dr. Stallman told Beth that if the neck pain she was experiencing did not go away in

seven to ten days to let him know and he would do an MRI.  Over the next few

months, Beth's neck stiffness and pain increased gradually.  Beth's mother,

Marlene Jordan, testified:

> I would ask her almost daily how are you feeling today.  And she would
> express more and more and more.  It was a gradual increase of this pain that
> her neck was hurting her, and she'd had referred pain up over her head into
> her eye.

On May 9, 2009, "Mother's Day," Beth woke up with excruciating neck

pain.  It felt as if someone shot her "point blank in the back of the neck."  Mrs.

Jordan testified, "there was this gradual buildup of pain that had been going on

over several months.  That morning it was excruciating."  The excruciating pain

persisted over the next few days and necessitated contacting Dr. Stallman on May

11, 2009.  Dr. Stallman agreed to do an MRI stat.  Beth then called her family

physician, Lisa Robertson, D.O., and she wrote out the order for the imaging.  On

May 11, 2009, an MRI of the cervical spine was performed and revealed a small

central left herniation at C4-C5, a central right herniation at C5-C6, and a central

left herniation at C6-C7.  During this time, Beth's father, Jerome Jordan, M.D.,

prescribed Beth with some Percocet, Valium, and a Medrol Dosepak.

On May 12, 2009, Beth was seen by Joseph E. Cronkey, M.D., an

orthopedic surgeon. At time, Beth's symptoms were neck pain, aggravated by

movement. Dr. Cronkey's treatment plan was physical therapy and to continue with the previously recommended Medrol Dosepak. Beth underwent physical therapy at Mackarey & Mackarey Physical Therapy Consultants, LLC from May 13, 2009 until August 5, 2009. Beth also received chiropractic and acupuncture treatment by Maryjoyce Rotella, D.C. from October 16, 2009 to December 30, 2009.

When she saw Dr. Cronkey on September 8, 2009, Beth was complaining not just of neck pain, but radicular symptoms in her upper extremity. Dr. Cronkey's recommendation at that time was to repeat the Medrol Dosepak to be followed by Celebrex and to consider evaluation by pain management for performance of epidural injections. Additionally, Dr. Cronkey recommended that Beth seek evaluation by a spine surgeon about the possibility of cervical disc surgery.

Dr. Cronkey evaluated Beth again on September 25, 2009. At this time, Beth was presenting with persistent neck pain with radicular symptoms of the right upper extremity and occipital area headaches. Dr. Cronkey prescribed a tens unit. His recommendation again was to seek evaluation by pain management and a cervical spine surgeon.

Beth saw William R. Prebola, M.D. on October 21, 2009. At that time, it

951016.1

was Dr. Prebola's impression that Beth had suffered a cervical disc herniation with right cervical radiculopathy and cervical myofascial spasms as a direct and proximate result of the incident at Toys "R" Us on October 26, 2008. Additionally, he felt that Beth had worsening of migraine headaches, which was also caused by the incident at Toys "R" Us. His prognosis for her full recovery was extremely poor. He opined that Beth will have pain on a permanent basis. His worst-case scenario entailed anterior cervical discectomy and fusion and complete and total disability. Dr. Prebola noted that Beth has a blood clotting disorder (Factor V blood dyscrasia), which places her at a significant risk with any type of surgical intervention.

Beth was evaluated by Matthew T. Kline, M.D. on February 8, 2010 for symptoms of chronic neck pain and headaches. At that time, Dr. Kline believed Beth was experiencing either atlantoaxial joint or C2-3 facet joint related neck pain and headaches. He recommended that Beth undergo diagnostic atlantoaxial joint injections to determine the source of her symptoms. On February 24, 2010, Beth underwent a right atlantoaxial joint injection, which provided anesthetic phase relief of her right-sided occipital pain and headache. While the relief was only temporary, it provided important diagnostic information. On March 19, 2010, Beth underwent bilateral atlantoaxial joint injections which resulted in

951016.1

temporary anesthetic phase relief of both right and left-sided occipital pain and headaches. Based upon the results of these two procedures, the diagnosis of bilateral atlantoaxial joint mediated neck pain and headaches was made. Based upon this diagnosis, Dr. Kline concluded that Beth was an excellent candidate for a ventral C2 rhizotomy and recommended this procedure to be performed on both sides. On May 12, 2010 and May 19, 2010, Beth underwent left and right C2 ventral rhizotomies, respectively.

On April 24, 2010, Dr. Kline issued a report in which he opined that Beth's current symptoms of chronic daily neck pain, bilateral occipital pain, and headaches, as well as the symptomatic C5-C6 disc herniation, are all causally related to the incident on October 26, 2008 at Toys "R" Us. Additionally, Dr. Kline indicated that "the severity of Beth's chronic neck pain and headaches have significantly limited her ability to work with a subsequent decrease in her earning capacity."

Following the left and right C2 ventral rhizotomies performed in May, Beth experienced significant relief of her bilateral occipital headaches for approximately 10-12 weeks. Unfortunately, however, the relief was not permanent and she developed recurring symptoms. A repeat right C2 ventral rhizotomy was performed by Dr. Kline on September 8, 2010. This procedure

951016.1

proved more challenging than the original procedure since it was difficult to isolate the nerve pathway. This procedure took longer and was more painful for Beth. Ultimately, due to the complication and resulting pain to Beth, a left-sided rhizotomy that had been scheduled for September 15, 2010 was not performed.

In his November 26, 2010 report, Dr. Kline notes his disappointment that the relief from the initial rhizotomies was so short lived as it was his hope that the duration of relief would equal or exceed twelve (12) months from the initial treatment. In his report Dr. Kline discusses the potential for a C1-2 joint fusion. He notes that this surgical procedure has considerable risks given the proximity to the vertebral artery and Beth's underlying clotting disorder. Dr. Kline also notes that Beth's work as an optometrist creates significant mechanical demands on the cervical spine due to the awkward positions she must assume in order to test and treat her patients. The injury that she sustained reduced the potential for Beth to resume her clinical duties on a full time basis. Dr. Kline opines that it is likely that she will never be able to work more hours than she is currently doing and that it is possible that she could be fully disabled from her work as an optometrist.

On February 25, 2011, Beth underwent a left C2 ventral rhizotomy by Dr. Kline to treat her left C1-2 mediated neck pain and headaches.

Beth was evaluated by Cynthia Edwards-Hawver, Psy.D. on October 16,

951016.1

2009. At that time, Dr. Hawver diagnosed Beth with: (1) major depressive disorder, (2) panic disorder, (3) generalized anxiety disorder; and (4) posttraumatic stress disorder. Dr. Hawver opined that these diagnoses are causally related to the incident on October 26, 2008 at Toys "R" Us. Dr. Hawver's prognosis for Beth to make a full recovery from the above-noted diagnoses was "fair to poor."

Additionally, Dr. Hawver noted that Beth has a history of Anorexia Nervosa Binge Purge Type, but that her eating disorder had been in full remission for over fifteen (15) years prior to the October 26, 2008 incident. While Beth did not currently meet the diagnostic criteria for an eating disorder, it was reported that Beth did have an episode of purging in June of 2009 and that she was now a high risk for relapse. An eating disorder is associated with a need for control and at the time of Dr. Hawver's evaluation everything in Beth's life was out of control.

Beth reported to Dr. Hawver that the incident and related injuries were taking a huge toll on her mental health and well-being. She reported that she felt depressed and anxious all the time. She felt that she was losing quality time with her children and husband. Beth also reported that she had always been a very active person and would ski in the winter, swim in the ocean in the summer, cook elaborate dinners for her family, play outside with her children, and clean her

951016.1

home.  At the time of her evaluation, Beth was in too much pain to ski or play outside with her boys and could not work out.  She related that over the summer she was very depressed because all she could do at the beach was watch her husband in the ocean playing with the children.  She also expressed how difficult it is to cook, which is something she really used to enjoy.  Beth reported that she feels like a failure as a mother and wife since the incident.  Her children keep asking her when "super mom" is going to return and it makes her very upset.

On April 25, 2010, Dr. Hawver evaluated Beth a second time.  At that time Dr. Hawver again diagnosed Beth with: (1) major depressive disorder; (2) panic disorder, (3) generalized anxiety disorder; and (4) posttraumatic stress disorder.  Dr. Hawver reiterated that these diagnoses are causally related to the incident on October 26, 2008 at Toys "R" Us.  Dr. Hawver's prognosis for Beth to make a full recovery from these diagnoses was downgraded to "poor."

During her second evaluation by Dr. Hawver, Beth began to cry as she discussed how good it had felt to have a few weeks without pain following the left and right C2 ventral rhizotomies.  She was able to enjoy her children and her husband again.  Beth reported that her son said, "super mom is back," which broke her heart because she knew the relief would not last.  Since the pain was now returning she reported that she found herself being irritable and depressed again.

951016.1

She reported that she was snapping at her husband and children. Beth reported that she felt as if her whole sense of self, both physically and mentally, were being beaten down. It was noted that Beth was trying to work at least four (4) days a week, but she was not able to keep up. Beth reported that she wondered if she would be able to return to working full time and that this was upsetting to her because she loved her job. Beth stated that she thought her anger over what had happened would decrease over time, but she found that it was getting worse. She reported that there were days where she could not think about anything other than the incident and she was filled with rage over how it had affected her and her family. She stated that things she used to enjoy doing were all taken from her. Beth reported that her anxiety and depressive symptoms had gotten much worse.

On June 24, 2010, Dr. Hawver evaluated D.J.F., now age nine (9). At that time Dr. Hawver diagnosed D.J.F. with: (1) major depressive disorder, (2) generalized anxiety disorder; and (3) posttraumatic stress disorder. Dr. Hawver opined that these diagnoses are causally related to D.J.F. witnessing the injury to his mother at Toys R Us on October 26, 2008.

It was noted that D.J.F. felt a lot of anger over what had happened to his mother and he thought about the incident on a regular basis. It was documented that D.J.F. had been having nightmares/night terrors since his mother's incident,

951016.1

which involved things falling on her and bad things happening to people he loves.

Specifically, he had a lot of nightmares about people dying.  He reported that he

sometimes woke up in the middle of the night and could not fall back asleep.  He

noted that he thinks he sees things in his room, but tries to tell himself that they

are not real.  It was noted that he is very jumpy and extremely protective of his

mother.  Additionally, it was observed that he has sweaty hands, racing heart,

trouble breathing, and feels sick to his stomach when he thinks of the incident.  It

was noted that D.J.F. had a lot more fears than he did prior to the incident.  It is

further noted that D.J.F. is not good with change and that this incident has caused

him to experience a lot of change in his life, which is upsetting to him.  It was

reported that D.J.F. has made numerous trips to the nurse's office which is unlike

him.  He often experienced upset stomach and headaches while at school.

Beth Flickinger and Brad Flickinger were evaluated by Richard E.

Fischbein, M.D. on September 29, 2010.  Like Dr. Hawver, Dr. Fischbein

diagnosed Beth with: (1) major depressive disorder, (2) panic disorder, (3)

generalized anxiety disorder; and (4) posttraumatic stress disorder.  Dr. Fischbein

opines that Beth's psychiatric diagnoses are causally related to the events of

October 26, 2008.  He also noted that prior to the incident, Beth had a history of

Anorexia Nervosa, Binge/Purge Type, which was in remission.  However, it was

951016.1

29

noted that her eating disorder had resurfaced and has been exacerbated by the incident.  Dr. Fischbein noted that Beth's chronic pain contributes to her depression and that her depressive symptoms, anxiety, and posttraumatic stress disorder make her less tolerant of her chronic pain.

Dr. Fischbein diagnosed Brad Flickinger with "an adjustment disorder with an anxiety component as a result of the changes occurring in the family dynamics and with his wife and the additional pressures placed on him."[5]  Dr. Fischbein notes that Brad has taken on more home responsibilities as a result of his wife's physical limitations.  He has to prepare more of the meals and do more housework. In the past, Beth had no physical limitations and was very active in activities with the children and maintaining the household.  He also needs to work longer hours and feels much more pressure to provide for the family.  This is based on his wife having to cut back on her hours significantly and a resulting decrease in her salary.

On October 15, 2010, Dr. Prebola examined Beth and issued a supplemental report.  At the time, Dr. Prebola's impression was: (1) cervical disc herniation, (2) cervical myofascial spasms, (3) right cervical radiculopathy, with aggravation of

---

[5] While Brad is pursuing a loss of consortium claim, he is not pursuing any claim for the adjustment disorder with anxiety component diagnosed by Dr. Fischbein.

951016.1

migraine headaches and reactive depression, and (4) bilateral atlantoaxial mediated neck pain and headaches at the C2 level. These diagnoses were all related to the Toys "R" Us incident on October 26, 2008. In this report, Dr. Prebola indicates that Beth has suffered a "permanent injury with permanent impairment." Dr. Prebola opines that Beth has had a "permanent diminished earning capacity and does suffer permanent disability." He adds, "Unfortunately, she will never recover from this injury. She can expect to have permanent pain and permanent impairment into the future."

**(1) Principal injuries sustained:**

As indicated above, the principal injuries sustained by Beth are:

a. Traumatic C5-6 right cervical disk herniation with cord effacement;
b. C4-5 left paracentral disk protrusion;
c. C6-7 left paracentral disk protrusion;
d. Significant atlantoaxial joint pain and arthropathy C1-C2;
e. Severe cervical myofascial pain syndrome involving the right cervical paraspinals, right trapezius, right rhomboids, right supraspinatus, and shoulder and neck musculature;
f. Right cervical radiculopathy, C6 secondary to the right C5-6 disk herniation;
g. Chronic pain secondary to the disk herniations at multiple levels, and the facet arthropathy, cervical radiculopathy, and myofascial pain;
h. History of migraine headaches which were controlled but are now triggered by musculoskeletal headaches due to the cervical disk herniation, facet arthropathy, and myofascial pain;
i. Sensory loss in the right upper extremity in the right C6

        dermatome distribution;

j.     Sleep disruption and depression secondary to myofascial pain and cervical disk herniation and atlantoaxial joint pain;

k.    Major Depressive Disorder;

l.     Panic Disorder without Agoraphobia;

m.   Posttraumatic Stress Disorder;

n.    Generalized Anxiety Disorder;

o.    Sense of worthlessness compared to her prior image as super mom and her inability to contribute as actively in both her work and her family life; and

p.    Physical impairment and disability with regards to marital relationship secondary to the cervical involvement.

**(2) Hospitalization and convalescence:**

<u>See</u> discussion above.

**(3) Present disability:**

As a result of the injury on October 26, 2008, Beth has sustained a permanent impairment resulting in a severe permanent disability that does and will impact her ability to be competitively employed as an optometrist.  Beth will not be able to carry out the essential functions of her occupation on a full time basis. This has and will result in a significant impairment of her earning capacity and will over time progress to a permanent total disability impacting her work capacity and work-life expectancy.

**(4) Special monetary damages, loss of past earnings, medical expenses, property damages, etc.:**

951016.1

At the time of the incident, Beth was employed as an optometrist at NEI in the Clarks Summit office. Beth represents the third generation of eye care physicians in this well-established practice in Northeastern Pennsylvania. Beth's grandfather, James Jordan, M.D., was a well-known ophthalmologist. Beth's father, Jerome Jordan, M.D., was one of the founding members of NEI. The "Jordan" name is synonymous with excellent eye care in Northeastern, Pennsylvania. Beth always wanted to be an optometrist when she grew up. Indeed, she wanted to carry on the family practice at NEI. She even wanted to marry an optometrist.

Beth attended Villanova University and graduated with a B.A. degree in May 1993. She then attended the Pennsylvania College of Optometry in Philadelphia, where she was awarded a B.S. degree in May 1997 and Doctor of Optometry degree in May 1999. Beth and Brad met while they attended the Pennsylvania College of Optometry. They were married in 1998. As noted, they have two sons, D.J.F. and J.B.F. They reside in Clarks Summit a short distance from where Beth and Brad practice.

Beth began her professional practice with NEI in May, 1999. Since 2007, Beth's compensation at NEI was calculated under a formula equal to her base salary or 30% of her gross receipts, whichever was greater. Gross receipts include

fees from professional services rendered and the sale of ancillary items like contacts and glasses. It should be noted that the Clarks Summit office is very lucrative and sells a greater volume of high-end luxury frames compared to other NEI locations.

On April 3, 2008, Beth announced that she was expanding her appointment schedule effective April 1, 2008 to 26.5 hours spread over four (4) days. Her new schedule ended at 3:00 p.m. on Monday, Wednesday, and Thursday in order for her to pick up her sons after school. It was her plan to expand to a regular full-time schedule when her youngest son J.B.F. started high school in the fall of 2018. Beth, however, had the opportunity and potential earning capacity to return to a regular full time schedule at any time if she desired. Beth planned to work until the age of 70. Confirming this fact is a 401(k) Action Plan completed on March 12, 2007 indicating that Beth intended to retire at age 70.

At the time of the incident, Beth was earning a guaranteed base salary of $115,000. As a result of her injuries from the incident at Toys "R" Us, Beth had to reduce her hours and the number of patients she could see. Thus, in April of 2010, her guaranteed annual salary was reduced to $75,000.

Joseph J. Carroll, the C.F.O. of NEI, selected Michael Boland, O.D. as the best comparator to Beth for purposes of calculating her loss of earning capacity.

951016.1

Dr. Boland's professional and personal profile is remarkably similar to Beth's.

Like the Jordan name, the Boland name is well known in the Scranton-Clarks

Summit area. Dr. Boland's grandfather was an active ophthalmologist and, like

Beth, his father was a founding member of NEI. Dr. Boland received his

optometry degree from the same school as Beth and started at NEI just one year

before Beth. He is one year younger than her. Dr. Boland works primarily out of

the Clarks Summit office. Both have the same type of patients with a high

percentage of refraction examinations. Also, like Beth, Dr. Boland's

compensation is based on 30% of gross receipts. Dr. Boland recorded over

$1,000,000 in collected gross receipts in 2010. Using the established

compensation rate of 30%, Dr. Boland earned over $300,000 in 2010.

In the first eight (8) months of 2010, Dr. Boland had 4,504 scheduled

appointments, which is equivalent to an annual rate of over 6,700 for the full year.

While Dr. Boland is at or near capacity in terms of patient appointments, Beth's

practice had substantial room to grow and new patients that contacted NEI could

have been directed to her through the NEI call-center. Additionally, Beth was

poised to inherit the optometry practice of her uncle, Arthur J. Jordan, O.D., who

is currently seventy-three (73) years-old and is expecting to retire in the near

future. Thus, but for this incident, Beth's practice was expected to grow

951016.1

substantially.

Plaintiffs have retained two economists (Dr. Jonathon A. Cunitz and Andrew C. Verzilli, M.B.A.) and one accountant (William R. Lazor, C.P.A.) to address Beth's wage loss/loss of earning capacity.  As documented in their reports, Plaintiffs' economic experts opine that Beth will sustain economic damages in the range of approximately $7,000,000 to $12,000,000.  Mr. Verzilli, Mr. Lazor, and Dr. Cunitz all utilized Michael Boland, O.D. as suggested by Mr. Carroll as a comparator to Beth Flickinger given the overwhelming similarity in background, age, experience, and practice, as noted above.

**(5) Estimated value of pain and suffering:**

Plaintiffs estimate Beth's past and future pain and suffering to be worth $5 million dollars.

**(6) Special damage claims:**

Plaintiffs are pursuing a negligent infliction of emotional distress claim for Plaintiff, D.J.F., based on being in the zone of danger of the falling candy bin and observing the candy bin strike and remain pinned on his mother.

**E.     Names and addresses of witnesses, along with the specialities and qualifications of experts to be called.**

<u>See</u> attached witness list.

**F.    Summary of testimony of each expert witness:**

Counsel agreed that they would attach their expert reports to this Pre-Trial

Memorandum.  <u>See</u> attached exhibits.

**G.    Special comment about pleadings and discovery, including depositions and the exchange of medical reports:**

None at this time.

**H.    A summary of legal issues involved and legal authorities relied upon:**

**1.    Conflict of Laws**

As the forum state, Pennsylvania's conflict of laws rules apply.  <u>Erie</u>

<u>Railroad v. Tompkins</u>, 304 U.S. 64 (1938); <u>Klaxon Co. v. Stentor Manufacturing</u>

<u>Co.</u>, 313 U.S. 487 (1941).  In resolving conflict of law issues, Pennsylvania

applies a "hybrid approach," which combines the significant relationship test and a

governmental interests analysis.  <u>See</u> <u>Manning v. Richards</u>, 15 D. & C.4th 91, 92

(York Cty. 1992).  As such, Pennsylvania has abandoned the "lex loci" or place of

injury rule relative to resolving conflict of law issues in tort cases, and thus,

refuses to automatically apply the law of the place in which the injury occurred.

<u>See</u> <u>Griffith</u>, 203 A.2d 796 at 805.  Instead, Pennsylvania applies a more flexible

rule that analyzes the policies and interests underlying a particular issue and

applies the law of the state most concerned with the outcome of the litigation.  <u>Id.</u>;

951016.1

Miller v. Gay, 470 A.2d 1353, 1355 (Pa. Super. Ct. 1983).

Applying Pennsylvania's conflict of laws rules, Pennsylvania law should apply with regard to both liability and damages. While the incident did occur in the state of New York, New York has no interest in the instant litigation and the fact that Plaintiffs' injuries took place within its borders is merely fortuitous. Moreover, Toys "R" Us is a citizen of Delaware and New Jersey, not New York. On the other hand, Pennsylvania is more intimately concerned with the outcome of this litigation since Plaintiffs are all citizens of the Commonwealth. Since Defendant does not agree that Pennsylvania law applies, Plaintiffs will be filing a separate motion and supporting brief outlining in greater detail why Pennsylvania law should apply. For purposes of this Pre-Trial Memorandum, Plaintiffs will address only Pennsylvania law.

### 2.    Negligence

Under Pennsylvania law, a cause of action for negligence is proven by establishing a legal duty of care, a breach of that duty by the defendant, and injury to the plaintiff causally related to the breach of duty. E.g., Mathews v. Konieczny, 527 A.2d 508, 511-12 (Pa. 1987). Stated otherwise, the elements of a negligence action are:

(1)    a duty recognized by law, requiring the actor to conform to a certain

951016.1

standard of conduct, for the protection of others against unreasonable risks;

(2)   the failure on his part to conform to the standard required;

(3)   a reasonably close causal connection between the conduct and the resultant injury; and

(4)   actual loss or damage resulting to the interests of another.

E.g., Macina v. McAdams, 421 A.2d 432, 434 (Pa. Super. 1980); Prosser, Law of Torts, Section 30 at 143 (4th Ed. 1971).

### Duty Owed to Invitees/Business Visitors

At the time of the incident, Beth and her two minor children, D.J.F. and J.B.F., were invitees/business visitors at Defendant, Toys "R" Us' international flagship store.

The highest duty of care owed by a possessor of premises is to invitees.

*Restatement (Second) of Torts*, §332 defines an invitee as follows:

(1)   An invitee is either a public invitee or a business visitor.

(2)   A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3)   A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

In general, the duty owed to an invitee by the possessor of premises requires

951016.1

39

that the property be maintained in reasonably safe condition for its intended purposes. <u>Finney v. G.C. Murphy Co.</u>, 161 A.2d 385 (Pa. 1960). The *Restatement* more specifically defines the duty owed to an invitee. The duty owed to an invitee as a result of dangerous conditions on the premises is outlined at *Restatement (Second) of Torts* §343, which has been recognized as the law of Pennsylvania. Section 343 provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

> 5.   knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees;

> 6.   should expect that they will not discover or realize the danger, or will fail to protect themselves against it; and

> 7.   fails to exercise reasonable care to protect them against the danger.

<u>See</u>, <u>Spinelli v. Costco Wholesale Corp.</u>, 2003 W.L. 23096887, *1 (citing *Restatement (Second) of Torts*, § 343 (1965) with approval).

With respect to dangerous conditions on the premises, the key distinction between the duty owed to an invitee and the duty owed to a licensee is the obligation of the possessor to inspect the premises. An invitee is entitled to anticipate that the possessor will have inspected the premises for dangerous

951016.1

conditions and either warn the invitee of those conditions or correct them; whereas the possessor is not obligated to a licensee to survey the property for dangerous conditions. *Restatement (Second) of Torts*, § 343 cmt. d. (1965), cited with approval in Mitchell v. ALDI, Inc., 57 Pa.D.&C.4th 508, 519 (2002).

Different considerations come into play regarding the duty owed to an invitee depending on whether the condition at issue was created by the actions of the possessor of the property or otherwise. When the defendant's conduct creates the dangerous condition, it is not necessary to show that the defendant had notice of the condition. Finney v. G.C. Murphy Co., 161 A.2d 385 (Pa. 1960); Hayden v. City of Philadelphia, 112 A.2d 812 (Pa. 1955); Clark v. Glosser Bros. Dep't Stores, Inc., 39 A.2d 733 (Pa. Super. 1944); Penn v. Isaly Dairy Co., 198 A.2d 323 (Pa. 1964).

### 3.   *Res Ipsa Loquitor*

In Pennsylvania, *res ipsa loquitor* is a rule of circumstantial evidence and when applied raises a permissible inference of negligence. Jones v. Harrisburg Polyclinic Hospital, 437 A.2d 1134 (Pa. 1981); Gilbert v. Korvette, Inc. 327 A.2d 94 (1974); Smick v. Philadelphia, 638 A,2d 287 (Pa. Commw. 1994). In 1974, the Pennsylvania Supreme Court, in Gilbert v. Korvette, Inc. 327 A.2d 94 (1974), adopted the *Restatement (Second) of Tort's* articulation of *res ipsa loquitor*. The

951016.1

court accepted the persuasive authority of the *Restatement* and defined this section

as "a far more realistic, logical, and orderly approach to circumstantial proof of

negligence than the multiple doctrines formerly employed in Pennsylvania." Id. at

100.

Section 328D of the *Restatement (Second) of Torts* states:

(1)    It may be inferred that harm suffered by the plaintiff was caused by
the negligence of the defendant when:

    a.    the event is of a kind which ordinarily does not occur in the
absence of negligence;

    b.    other responsible causes, including the conduct of the plaintiff
and third persons, are sufficiently eliminated by the evidence;
and;

    c.    the indicated negligence is within the scope of the defendant's
duty to the plaintiff.

(2)    It is the function of the court to determine whether the inference may
reasonably be drawn by the jury, or whether it must necessarily be
drawn.

(3)    It is the function of the jury to determine whether the inference is to
be drawn in any case where different conclusions may reasonably be
reached.

*Restatement (Second) of Torts*, §328D.

Under Pennsylvania law, the application of *res ipsa* does not give rise to a

rebuttable presumption,  Gilbert, *supra*, it does not vanish in the face of contrary

evidence, <u>Sedlitsky v. Pareso</u>, 582 A.2d 1314 (Pa. Super. 1990), nor does it shift

the burden to the defendant, <u>Gilbert</u>, *supra*.  It merely permits the fact finder to

draw an inference of negligence from the circumstances proven.  <u>Id.</u>  *Res ipsa*

need not be specifically pleaded, but may be applied by the court if warranted by

the evidence.  <u>Hollywood Shop, Inc. v. Pennsylvania Gas and Water Co.</u>, 411 A.2d

509, 513 (Pa. Super 1979)(quoting <u>Fassbinder v. Pennsylvania R.R. Co.</u>, 322 F.2d

859, 863 (3d Cir. 1963)).

### 4.    Negligent Infliction of Emotional Distress

Pennsylvania previously adhered to the rule that one seeking recovery for

emotional distress could not recover unless the plaintiff suffered a physical

impact.  The rationale was that if recovery were permitted in situations where there

was no physical impact, the "courts would be swamped by a virtual avalanche of

cases."  <u>Knaub v. Gotwalt</u>, 422 Pa. 267, 271, 220 A.2d 646, 647 (1966).  In

<u>Neiderman v. Brosky</u>, however, the Pennsylvania Supreme Court abandoned the

physical impact requirement in cases where the Plaintiff was located within the

"zone of danger" and actually feared for his/her own safety.  436 Pa. 401, 261

A.2d 84 (1970).  Finally, in recognition of the tremendous emotional impact that a

close relative experiences when a loved one suffers injury, the Pennsylvania

Supreme Court extended liability for negligent infliction of emotional distress to

951016.1

situations where the emotional distress was a foreseeable result of the defendant's conduct. Sinn v. Burd, 486 Pa. 146, 169-170, 404 A.2d 672, 684 (1979)(emphasis added).

In Sinn, a mother who was standing on her porch witnessed a motor vehicle strike her daughter. Id. at 674. In a subsequent action, she alleged that observing the accident caused shock to her nervous system resulting in depression. Since Plaintiff was not herself in danger of a physical impact at the time of the accident, the trial court dismissed the negligent infliction claim. Abandoning the "zone of danger" requirement, the Supreme Court held that plaintiff was entitled to recover for her emotional distress because her injuries were a reasonably foreseeable result of defendant's conduct. Id. at 684 & 686 (emphasis added). The court set forth the following three factors to be considered in resolving the foreseeability issue:

1. Whether the plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it;

2. Whether the shock resulted from a direct emotional impact upon the plaintiff from the sensory and contemporaneous observance of the accident as contrasted with learning of the accident from others after its occurrence; and

3. Whether the plaintiff and the victim were closely related.

Id. at 685. This is known as the "bystander" rule. E.g., Brown v. Philadelphia College of Osteopathic Medicine, 674 A.2d 1130, 1133 (Pa. Super. 1996).

### 5.   Spoliation

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Mosaid Technologies Inc. v. Samsung Electronics Co.</u>, 348 F. Supp. 2d 332, 335 (D.N.J. 2004)(citing <u>Zubulake v. UBS Warburg LLC</u>, 229 F.R.D. 422, 2004 WL 1620866, at *15 (S.D.N.Y. 2004)(quoting <u>West V. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999)). The United States Court of Appeals for the Third Circuit has explained:

> The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established. When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production has done so out of the well-founded fear that the contents would harm him.

<u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 334 (3d Cir. 1995)(citing <u>Gumbs v. International Harvester, Inc.</u>, 718 F.2d 88, 96 (3d Cir. 1983)).

Federal law governs the imposition of sanctions for failure to preserve evidence in a diversity action. <u>Flury v. Daimler Chrysler Corp.</u>, 427 F.3d 939, 944 (11th Cir. 2005). The United States Court of Appeals for the Third Circuit has applied three key considerations in determining whether a sanction for spoliation of evidence is appropriate. <u>Schmid v. Milwaukee Electric Tool Corp.</u>, 13 F.3d 76,

78 (3d Cir. 1994). Those three considerations are: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. Id.

When appropriate, a court may impose any potential sanction including: (1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorney's fees and costs. Mosaid, 348 F. Supp. 2d at 335. See e.g., Ogin v. Ahmed, 563 F. Supp. 2d 539 (M.D. Pa. 2008)(J. Conaboy)(granting plaintiff's motion for spoliation charge where defendants failed to maintain pertinent driver's logs).

With respect to an adverse inference instruction, four factors must be satisfied. Those factors are: (1) the evidence must be within the party's control; (2) it must appear that there has been actual suppression or withholding of the evidence; (3) the evidence destroyed or withheld was relevant to claims or defenses; and (4) it was reasonably foreseeable that the evidence would later be discoverable. Ogin, 563 F. Supp. 2d. at 543.

951016.1

### 6.   Reckless Indifference

The Plaintiffs have alleged that the conduct of the Defendant in this matter was not only negligent, but also recklessly indifferent.  In this regard, the appropriate legal standard in this matter for "reckless indifference" and ultimately the imposition of punitive damages is set forth below.

Pennsylvania has adopted Section 908 of the *Restatement (Second) of Torts* and the comments thereunder regarding the imposition of punitive damages. Martin v. Johns-Manville Corp., 494 A.2d 1088, 1096 (Pa. 1985); Chambers v. Montgomery, 192 A.2d 355, 358 (Pa. 1963); Dean Witter Reynolds, Inc. v. Genteel, 499 A.2d 637, 642 (Pa. Super. 1985).  A finding of "evil motive" is not a prerequisite to punitive damages. Pennsylvania law is clear that  "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others." *Restatement (Second) of Torts,* §908(2).  As such, the Plaintiffs need not prove the Defendant acted vindictively or with bad motive.  Id.; SHV Coal, Inc. v. Continental Grain Co., 587 A.2d 702, 704-05 (Pa. 1991).

The Pennsylvania Supreme Court has recognized that "[p]unitive damages may be imposed for 'torts that are committed willfully, maliciously, or so carelessly as to indicate wanton disregard of the rights of the person injured.'"

951016.1

GJD v. Johnson, 713 A.2d 1127, 1129 (Pa. 1998).   In defining recklessness, the

Pennsylvania Supreme Court has determined that it is sufficient if the actor knows

or has reason to know of facts which create a high risk of physical harm to another

and deliberately proceeds to act or fails to act in conscious disregard of that risk.

Martin, 494 A.2d at 1097.   See also SHV Coal, 587 A.2d at 704 (reckless

indifference present where "the actor knows, or has reason to know . . . of facts

which create a high degree of risk of physical harm to another, and deliberately

proceeds to act, or to fail to act, in conscious disregard of, or indifference to that

risk.") (citing Restatement (Second) of Torts, §500 cmt. (a)).   In fact, if an actor's

conduct involves a serious risk of harm to those within the range of its effect, the

fact that the actor knows or has reason to know that others are within such range is

conclusive of his recklessness towards them.   Evans v. Philadelphia Transp. Co.,

418 Pa. 567, 575, 212 A.2d 440 (1965) (citing comment 3 to §500 of the

Restatement (Second) of Torts).   Actual prior knowledge of the peril is not

required.   Evans, 212 A.2d at 443; see also In re One Meridian Plaza Fire Litig.,

820 F. Supp. 1460, 1488 (E.D. Pa.) (denying the defendant's motion to dismiss

punitive damages claim because punitive damages are appropriate if the defendant

either knew or should have known of risk of harm), rev'd on other grounds, 12

F.3d 1270 (3d Cir. 1993).   In determining whether an actor possesses the requisite

951016.1

mental state, the fact-finder may consider the seriousness of any potential harm. The more serious the possible harm, the greater the inference is that the actor is likely to perceive the risk of that harm.  Martin v. Johns-Manville Corp., 494 A.2d 1088 n.12 (Pa. 1985).

### 7. Loss of Future Earnings/Potential Earning Capacity

Under Pennsylvania law, a plaintiff may recover for the probable loss of future earnings when she suffers an injury that causes a loss of future earning power.  See Kaczkowski v. Bolubasz, 421 A.2d 1027, 1030-31 (Pa. 1980). Pursuant to Kaczowski, lost future earnings are neither reduced to present value nor adjusted upward to reflect the effects of future inflation.  In Kaczkowski, the Pennsylvania Supreme Court adopted the approach that, although inflation is an economic reality that must be taken into account, future inflation is presumptively equal to future interest rates in the context of projected earnings.  Id. at 1027.  The Pennsylvania Superior Court declared the continuing validity of the Kaczkowski approach in Sonlin v. S. Abington Mem. Hosp., 748 A.2d 213, 218-19 (Pa. Super. Ct. 2000); see also Arcila v. Christopher Trucking, 195 F. Supp. 2d 690, 693 (E.D. Pa. 2002) (noting that Kaczkowski instructs courts of the Commonwealth to abandon the practice of discounting lost future earnings).  Accordingly, under Pennsylvania law, any reference to a reduction of Beth's claim for future earnings

951016.1

to "present value" or "present worth" is entirely improper and should be prohibited by this Court.

In <u>Kaczkowski</u> the Pennsylvania Supreme Court held:

> When an injury is a permanent one, one which will cause a loss or lessening of future earning power, a recovery may be had for the probable loss of future earnings. If the injured party survives, he should receive undiminished, his total estimated future earnings.

421 A.2d at 1030 n. 7 (internal citation omitted).  Stated otherwise, in determining lost wages in Pennsylvania, it is proper for an expert to base her calculations on the probable loss of future, as opposed to past, earning power, potential, and/or capacity.

## I.   Stipulations desired.

None at this time.

## J.   Estimated number of trial days:

Plaintiffs and Defendant jointly agree that they cannot make a realistic determination as to the estimated number of trial days until after the resolution of the *Daubert* hearing.

## K.   Any other matter pertinent to the case to be tried:

During the attorney conference on March 24, 2011, counsel agreed on the following:

951016.1

1.     Plaintiffs will supply Defendant with their expert liability rebuttal reports on or before April 6, 2011.

2.     Robert J. Nobilini, Ph.D. will not conduct any further testing with his mock-up. Plaintiffs reserve the right to test Dr. Nobilini's mock-up a few days before the *Daubert* hearing in accordance with this Court's March 23, 2011 Order.

3.     Plaintiffs and Defendant jointly request that they may exceed the 5,000 word limit set forth in L.R. 7.8(b) for their briefs in support and in opposition to pre-trial motions.

4.     After filing their motions in limine on Monday, March 28, 2011, counsel will confer to see if they can resolve any issues raised in said motions before the pre-trial conference scheduled for April 4, 2011.

5.     Plaintiffs and Defendant jointly request that jury selection take place after the *Daubert* hearing.

6.     Plaintiffs and Defendant jointly request permission to use a written questionnaire form during jury selection.

7.     Plaintiffs and Defendant jointly request six (6) peremptory challenges each, rather than the three (3) peremptory challenges set forth in F.R.C.P. 47.

8.     Plaintiffs and Defendant jointly agree that exhibits may be used during opening statements. Plaintiffs and Defendant jointly agree that any non-

951016.1

evidence based exhibit will be provided to the other side twenty-four (24) before use in opening.

9.    Plaintiffs and Defendant jointly agree that the case should be bifurcated with the first phase of trial to address the issues of negligence, reckless indifference, and compensatory damages, and the second phase of trial, if necessary, to address punitive damages.

10.    Plaintiffs and Defendant jointly request additional points for charge beyond the twelve (12) set forth in L.R. 51.1.  Specifically, Plaintiffs and Defendant jointly request twenty-four (24) points for charge for the first phase of trial and twelve (12) points for charge for the second phase of trial.

11.    Plaintiffs and Defendant jointly agree that non-expert, non-party factual witness shall be sequestered from the courtroom during trial.

12.    Defendant intends to call the following employees in his case-in-chief:

> Bill O'Keefe
> Jesus Orengo
> Lisa Lozada
> Suzanne Sallata
> Gislane Morel
> Marybet Rosado
> Gloria Whitehead

Plaintiffs also seek to call the above-referenced employees, and a few

951016.1

additional employees, during their case-in-chief, but as of cross-examination.

Even though Defendant is bringing the above-referenced employees in to testify

live, absent a Court Order, Defendant will not agree to allow Plaintiffs to call

these witnesses to testify in person during their case-in-chief.  Accordingly,

Plaintiffs intend to file a motion to compel the attendance of such employees.[6]

**L.     Pursuant to Local Rule 16.3 append to this memorandum a pre-numbered schedule of exhibits, with brief identification of each, on the clerk's Exhibit Form.**

See attached exhibit list.  Counsel agreed that they do not have to list the

exhibits they intend to use for cross-examination.

**M.     Append any special verdict questions which counsel desires to submit.**
See attached Proposed Jury Verdict Interrogatories.

**N.     Defense counsel must file a statement that the person or committee with settlement authority has been notified of the requirements of and possible sanctions under Local Rule 16.2.**

N/A.

**O.     Certification must be filed as required under Local Rule 30.10 that**

---

[6] As Plaintiffs will suggest in their Motion, an obvious remedy would be to direct Defendant to produce these witnesses in person during Plaintiffs' case-in-chief so that Plaintiffs may call them as of cross-examination, but to allow Defendant to exceed the scope of Plaintiffs' cross-examination during its direct examination.  While Plaintiffs offered to proceed in such fashion, Defendant refused to do so absent a Court Order.

951016.1

counsel have met and reviewed depositions and videotapes in an effort to eliminate irrelevancies, side comments, resolved objections, and other matters not necessary for consideration by the trier of fact.

Counsel have agreed that they will meet to discuss the above after the

*Daubert* hearing.

**P.    In all trials without a jury, requests for findings of both fact and law shall be submitted with this Memorandum as required under Local Rule 48.2.**

N/A.

Respectfully submitted,

HOURIGAN, KLUGER & QUINN, P.C.

BY:    s/Brian Q. McDonnell
Brian Q. McDonnell, Esquire
Hourigan, Kluger & Quinn, P.C.
600 Third Avenue
Kingston, PA 18704
Phone No: (570)287-3000
Fax No: (570)287-8005
E-mail:bmcdonnell@hkqpc.com
Identification Number: PA 204089

951016.1